1  STEPHAN C. VOLKER (CSB #63093)
   DANIEL P. GARRETT-STEINMAN (CSB #269146)
2  JAMEY M. B. VOLKER (CSB #273544)
   LAW OFFICES OF STEPHAN C. VOLKER
3  436 14th Street, Suite 1300
   Oakland, California  94612
4  Telephone:   (510) 496-0600
   Facsimile:   (510) 496-1366
5
   Attorneys for Plaintiff
6  WESTERN WATERSHEDS PROJECT

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10 WESTERN WATERSHEDS PROJECT,            )  Civ. No.
                                          )  **CV11·00492** DMG(Ex)
11              Plaintiff,                 )
                                          )  COMPLAINT FOR DECLARATORY
12      vs.                               )  AND INJUNCTIVE RELIEF
                                          )
13 KEN SALAZAR, in his official capacity as )
   Secretary of the United States Department of )
14 the Interior; BOB ABBEY, in his official )
   capacity as Director of the United States Bureau )
15 of Land Management; MIKE POOL, in his )
   official capacity as Deputy Director of the )
16 United States Bureau of Land Management; )
   UNITED STATES BUREAU OF LAND )
17 MANAGEMENT, a federal agency; ROWAN )
   GOULD, in his official capacity as Director of )
18 the United States Fish and Wildlife Service; )
   REN LOHOEFENER, in his official capacity as )
19 Regional Director of the Pacific Southwest )
   Region of the United States Fish and Wildlife )
20 Service; UNITED STATES FISH AND )
   WILDLIFE SERVICE, a federal agency; and )
21 UNITED STATES DEPARTMENT OF THE )
   INTERIOR, a federal agency, )
22                                        )
                                          )
23              Defendants                )
   _____ )

24

                          **INTRODUCTION**

25     1.      In 1976 Congress enacted unprecedented protection for the California Desert

26 Conservation Area in recognition of the fact that "the California desert environment is a total

27 ecosystem that is extremely fragile, easily scarred, and slowly healed," and because "the

28 California desert environment and its resources, including certain rare and endangered species of

wildlife, plants, and fishes, and numerous archeological and historic sites, are seriously threatened by air pollution, inadequate Federal management authority, and pressures of increased use . . . ." 43 U.S.C. §§ 1781(a)(2) and (3).  Congress directed the Secretary of the Interior to "prepare and implement a comprehensive, long-range plan for the management, use, development, and protection of the public lands within the California Desert Conservation Area" in part "to conserve these resources for future generations."  43 U.S.C. §§ 1781(d), 1781(a)(4). Among the "rare and endangered species of wildlife" intended to be protected are the desert tortoise and the desert bighorn sheep.

2. But in an ill-conceived rush to accommodate massive renewable energy projects vying for multi-billion dollar federal tax credits originally due to expire on December 31, 2010, the federal defendants precipitously approved unnecessarily destructive energy development of the California Desert Conservation Area without first conducting adequate environmental reviews.  Recognizing the impossibility of completing adequate environmental reviews within this initial deadline, Congress wisely extended the period for energy companies to qualify for these tax credits by one year, to December 31, 2011.  That extension provides the federal defendants with a rare and invaluable opportunity – guided by this Court's review – to address and rectify the significant errors and omissions that plagued their unduly hasty initial review of the Ivanpah Solar Electric Generating System Project ("ISEGS" or the "Project") whose approval is challenged herein.

3. Plaintiff brings this action to rectify defendants' failure to comply with critically important environmental laws when approving the Project.  In approving the Project, defendants violated the National Environmental Policy Act, 42 U.S.C. section 4321 *et seq.* ("NEPA"), the Endangered Species Act, 16 U.S.C. section 1531 *et seq.* ("ESA"), the Federal Land Policy Management Act, 43 U.S.C. section 1701 *et seq.* ("FLPMA"), and the Administrative Procedure Act, 5 U.S.C. sections 701-706 ("APA").  This Court's review will afford the defendants the time and direction they need to avoid unnecessary harm to the California Desert Conservation Area and needless waste of scarce taxpayer resources.

4. Defendants violated NEPA by preparing a legally inadequate Environmental Impact

1    Statement ("EIS").  Defendants violated FLMPA by approving the Project despite its

2    inconsistency with that law's policy and procedural mandates.  Defendants violated ESA by

3    certifying a legally deficient Biological Opinion ("BiOp") and by failing to reinitiate consultation,

4    as required, when impacts on endangered species proved to be greater than anticipated.  By

5    approving the Project despite these violations, defendants failed to proceed in the manner

6    required by law, in violation of the APA.

7          5.    The Project proposes the development of an approximately 5.4 square mile power

8    generation facility in the extremely sensitive California Desert Conservation Area.  Plaintiff and

9    many other citizens and organizations expressed concerns about, among other issues, the

10   Project's potentially severe impacts on species listed under the Endangered Species Act; the

11   Project's unstudied impacts on migratory birds; the Project's unknown impacts on groundwater

12   utilized by wildlife; and defendants' rejection of multiple environmentally preferable alternatives

13   to the Project.  Nevertheless, defendants declined to address these concerns, and failed to take the

14   required "hard look" at the Project's environmental impacts.

15         6.    Accordingly, plaintiff seeks orders from this Court: (1) granting preliminary

16   injunctive relief, restraining defendants from taking any action that would result in any change to

17   the physical environment in connection with the Project pending a full trial on the merits; (2)

18   declaring that defendants violated the APA by failing to comply with NEPA's requirements for

19   adequate environmental review of the Project; (3) declaring that defendants violated the APA by

20   approving the Project in violation of FLPMA's requirements; (4) declaring that defendants

21   violated the APA by failing to comply with ESA in their review of the Project; and (5) granting

22   permanent injunctive relief pending defendants' compliance with NEPA, FLMPA, and ESA.

23                        **JURISDICTION AND VENUE**

24         7.    This Court has jurisdiction in accordance with 28 U.S.C. section 1331 (action

25   arising under laws of United States); 28 U.S.C. section 1346 (United States as defendant); 28

26   U.S.C. section 1361 (action to compel officers of the United States to perform their duties); 28

27   U.S.C. sections 2102-2202 (power to issue declaratory and injunctive relief in cases of actual

28   controversy); and 5 U.S.C. sections 701-706 (APA).

8.      Venue is proper under 28 U.S.C. section 1391(e) because a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this district, and a substantial part of the property that is the subject of this action is situated in this district.

9.      This claim is timely filed within all applicable statutes of limitations.

10.     Plaintiff has standing to assert its claims because its member use and enjoy the federal public lands and resources that the Project would harm.  In particular, the members of Western Watersheds Project have hiked, picnicked, photographed plants, wildlife, wildlife habitats and cultural resources, and otherwise utilized the lands of the California Desert Conservation Area and the Project site within the Ivanpah Valley for recreation, cultural enrichment, aesthetic enjoyment, and wildlife and scenic viewing, and have concrete plans to do so in the future.  Their use and enjoyment of these public lands would be directly harmed should the Project be constructed and implemented as approved by defendants.

**PARTIES**

11.     Plaintiff WESTERN WATERSHEDS PROJECT is a non-profit conservation group founded in 1993 with approximately 1,400 members and with field offices in Idaho, Montana, Utah, Wyoming, Arizona and California.  WESTERN WATERSHEDS PROJECT's mission is to protect and restore western watersheds and wildlife through education, scientific study, public policy initiatives and litigation.  WESTERN WATERSHEDS PROJECT's members have in the past visited, and intend to continue in the future visiting, the Project site and vicinity, in order to enjoy its wildlife and other natural resources for health, recreational, scientific, spiritual, educational, aesthetic, and other purposes.  The environmental, aesthetic, recreational, scenic, scientific, historic, and cultural interests of WESTERN WATERSHEDS PROJECT and its members will be adversely affected and injured by defendants' failure to comply with applicable laws in the respects alleged herein, unless the requested relief is granted.

12      To the extent required, plaintiff exhausted all available administrative remedies.  No administrative appeals are available.

13.     Plaintiff has no plain, speedy, or adequate remedy at law, as defendants' unlawful actions are not otherwise reviewable in a manner that will ensure compliance with the laws whose

- 4 -

1    violation is alleged herein. Accordingly, plaintiff seeks injunctive and declaratory relief from this

2    Court to rectify defendants' unlawful acts.

3        14.    Defendant UNITED STATES DEPARTMENT OF INTERIOR ("DOI") is the

4    federal agency charged with managing most of the nation's federally owned lands, including the

5    public lands managed by the Bureau of Land Management at issue here, and also charged with

6    ensuring compliance with applicable laws, including but not limited to NEPA, ESA, and FLPMA,

7    in the management of those lands.

8        15.    Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM";

9    collectively with defendants SALAZAR, ABBEY and POOL, "BLM Defendants") is an agency

10   within DOI. Under federal law, BLM is charged with the management of federal lands for the

11   benefit of the public and consistent with all applicable laws.

12       16.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("FWS";

13   collectively with defendants GOULD and LOHOEFENER, "FWS Defendants") is also an agency

14   within DOI. Under federal law, FWS is charged with the preservation of endangered and

15   threatened species under ESA, and was required to comply with ESA's requirements when it

16   prepared the BiOp for the Project challenged herein.

17       17.    Defendant BOB ABBEY is the Director of BLM, and is sued in his official

18   capacity. In that capacity, he is generally responsible for the activities of BLM nationwide.

19   Defendant ABBEY is responsible for BLM's October 7, 2010, approval of the Record of

20   Decision ("ROD") for the Project.

21       18.    Defendant MIKE POOL is the Deputy Director of Operations of BLM, and is sued

22   in his official capacity. In that capacity, he is generally responsible for the activities of BLM

23   nationwide. Defendant POOL is responsible for BLM's October 7, 2010, approval of the Record

24   of Decision ("ROD") for the Project.

25       19.    Defendant KEN SALAZAR is the Secretary of DOI, and is sued in his official

26   capacity. Defendant KEN SALAZAR is the federal official charged with responsibility for the

27   proper management of BLM and FWS and is responsible for the actions of BLM and FWS

28   challenged herein. Defendant KEN SALAZAR, like defendants ABBEY and POOL, is

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1    responsible for BLM's October 7, 2010, approval of the ROD for the Project.

2        20.    Defendant REN LOHOEFENER is the Regional Director of the Pacific Southwest

3    Region of FWS, and is responsible for the actions of FWS in approving the BiOp challenged

4    herein. Defendant LOHOEFENER is sued in his official capacity.

5        21.    Defendant ROWAN GOULD is the Director of the FWS and is, in that capacity,

6    responsible for the overall activities of FWS nationwide, including the preparation of the

7    Biological Opinion at issue in this case. Defendant GOULD is sued in his official capacity.

8                                **PROCEDURAL HISTORY**

9        22.    This case challenges two separate actions by defendants.  First, plaintiff challenges

10   the BLM defendants' October 7, 2010, approvals, embodied in the ROD, of (1) various Right-of-

11   Way grants to developers of the Project and (2) a Land Use Plan Amendment to the California

12   Desert Conservation Area Plan.  As discussed below, these two approvals were unlawful for two

13   separate reasons:  they were based upon a legally inadequate EIS under NEPA, and they violate

14   the requirements of FLPMA.

15       23.    Second, plaintiff challenges the FWS defendants' October 1, 2010, approval of a

16   BiOp for the Project.  As discussed below, the BiOp is inadequate because it fails to comply with

17   ESA.

18       24.    The Project was first presented to the California Energy Commission ("CEC"),

19   whose approval was required under California law for the Project to proceed.  Plaintiff intervened

20   in the CEC approval process and submitted comments to CEC at every available opportunity.

21       25.    On November 10, 2009, BLM published a Notice of Availability of the Draft

22   ISEGS Environmental Impact Statement/Final Staff Assessment ("DEIS") and the Draft

23   California Desert Conservation Area Plan Amendment.  *See* 74 Fed.Reg. 58043.  This Notice

24   commenced a 90-day public comment period.  Plaintiff timely submitted comments prior to the

25   close of this comment period, pointing out the DEIS's inadequacies.

26       26.    On April 16, 2010, BLM published a Notice of Availability of the Supplemental

27   Draft Environmental Impact Statement ("SDEIS") for the Proposed ISEGS Project.  The SDEIS

28   was intended to "analyze[] two additional alternatives" and "clarif[y] the BLM's purpose and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1   need for the project." 75 Fed.Reg. 19992, 19993. The Notice commenced a 45-day public

2   comment period. *Id.* at 19992. Plaintiff timely submitted comments prior to the close of this

3   comment period, pointing out the SDEIS's deficiencies.

4         27.     On August 6, 2010, BLM published a Notice of Availability of the Proposed

5   California Desert Conservation Area Plan Amendment and Final Environmental Impact

6   Statement ("FEIS") for the Project. 75 Fed.Reg. 47619. This Notice initiated a 30-day public

7   comment and protest period. *Id.* Plaintiff timely submitted both comments regarding, and a

8   protest of, this action and document.

9         28.     On October 7, 2010, defendants Pool and Salazar signed and approved both the

10   California Desert Conservation Area Plan Amendment and the Right-of-Way Authorization.

11   These approvals were contained within BLM's ROD for the Project. Defendant Salazar also

12   signed and approved these actions. There is no administrative appeal within DOI of decisions by

13   defendant Salazar, as he is the highest official within DOI.

14                                     **FACTUAL BACKGROUND**

15         29.     On November 6, 2007, BLM published a notice of intent to jointly prepare with

16   CEC the DEIS for the Project and related California Desert Conservation Area Plan Amendment.

17   *See* 72 Fed.Reg. 62671. BLM published the DEIS on November 10, 2009, initiating a 90-day

18   public review period that ended on February 11, 2010. The DEIS eliminated from detailed

19   analysis all alternatives and fully examined only the originally proposed Project. Utilization of

20   locally distributed solar generation within the energy demand centers and locating the Project on

21   private land – alternatives that would protect the sensitive habitat of the Ivanpah Valley from

22   destruction – were discarded without serious consideration. The DEIS entirely failed to consider

23   the alternative of locating the proposed solar energy facilities on the Ivanpah Dry Lake bed. The

24   DEIS also did not identify or analyze any connected actions.

25         30.     On April 16, 2010, BLM published the SDEIS for the Project. The SDEIS was

26   intended to "analyze[] two additional alternatives" and "clarif[y] the BLM's purpose and need for

27   the project." 75 Fed.Reg. 19992, 19993. However, the two additional alternatives would make

28   only minor changes to the originally proposed Project, each reducing the Project's footprint by

1 about 500 acres.  Further, despite numerous DEIS comments from plaintiff, Sierra Club and
2 others suggesting such an alternative, the SDEIS still omitted any discussion of the Ivanpah Dry
3 Lake bed alternative.  The publication of the SDEIS commenced a 45-day public comment period
4 that ended on June 1, 2010. *Id.* at 19992.

5      31.    On August 6, 2010, BLM issued the Proposed California Desert Conservation Area
6 Plan Amendment and FEIS for the Project.  75 Fed.Reg. 47619.  This Notice initiated a 30-day
7 public comment and protest period, which closed on September 7, 2010.  *Id.*

8      32.    In the ISEGS FEIS, BLM selected the Mitigated Ivanpah 3 alternative as its
9 Agency Preferred Alternative.  The selected Project site would encompass approximately 3471.36
10 acres – 5.4 square miles – in eastern San Bernardino County, near the Nevada border.  The
11 Project would consist of three solar concentrating thermal power plants (Ivanpah 1, 2 and 3), each
12 relying on a field of elevated mirrors ("heliostats") to focus solar energy on boilers atop 459-foot
13 tall centralized towers.  The power plants would be developed sequentially, though they would all
14 rely on a cluster of shared facilities constructed along with the first power plant, including a
15 substation, administration and maintenance buildings, construction yards and a natural gas
16 pipeline situated within a 35-foot wide by 3,911-foot long right-of-way.  Upon completion of all
17 three power plants, the Project would generate a total of 370 MW of electricity.

18      33.    The FEIS, however, failed to adequately analyze the environmental impacts of the
19 selected Project, including but not limited to its impacts to bighorn sheep, desert tortoises,
20 migratory birds, and groundwater.  The FEIS also contains numerous other NEPA defects.  To
21 wit, among other deficiencies, the FEIS (1) fails to describe *BLM's* rather than the *applicant's*
22 purpose and need for the Project, (2) fails to analyze numerous reasonable alternatives, such as
23 locating the Project on the Ivanpah Dry Lake bed, locating the Project on private land, and using
24 locally distributed (such as roof-top) solar generation, (3) segments review of connected actions
25 like the Eldorado-Ivanpah Transmission Project, and (4) relies on yet-to-be-developed mitigation
26 measures to mitigate the Project's impacts.

27      34.    Furthermore, after the FEIS was issued, significant changes were made to the
28 Project.  These changes include revisions to BLM's Desert Tortoise Translocation Plan.

- 8 -

1    Nonetheless, BLM failed to prepare a supplemental EIS to analyze and apprise the public of these

2    changes and their impacts.

3        35.    On December 7, 2009, BLM requested formal ESA section 7 consultation with

4    FWS and transmitted to FWS its 2009 Biological Assessment ("BA") and other documents.  The

5    BA only identified one federally listed species that was likely to be adversely affected by the

6    Project – the desert tortoise, a threatened species.  FWS issued a draft ISEGS BiOp on April 26,

7    2010, but ultimately changed it in response to (1) comments from BLM and the Project applicant,

8    and (2) BLM's revisions to the tortoise translocation strategy.  FWS issued its final ISEGS BiOp

9    and accompanying Incidental Take Statement ("ITS") on October 1, 2010.

10        36.    FWS's BiOp, like the BA, fails to analyze the impacts on the desert tortoise from

11    actions related and/or connected to the Project, including the Eldorado-Ivanpah Transmission

12    Line ("EITP").  Without considering the impacts of connected actions, the BiOp concludes that

13    the Project is not likely to jeopardize the continued existence of the desert tortoise

14        37.    FWS's no jeopardy determination is conditioned on BLM's compliance with

15    enumerated conditions including triggers set forth in the ITS for reinitiation of consultation.

16    These triggers include (1) the death or injury of three or more tortoises in any one year or nine or

17    more tortoises over the life of the Project from *any* ISEGS activity, (2) the identification of more

18    than 38 subadult or adult tortoises for translocation during clearance surveys of the Project site,

19    and (3) the inability of translocation areas to accommodate all desert tortoises relocated from the

20    Project.

21        38.    On October 7, 2010, defendant Pool signed and approved both the  California

22    Desert Conservation Area Plan Amendment and the Right-of-Way Authorization for the four

23    separate rights-of-way required for the Project.  These approvals were contained within BLM's

24    ROD for the Project.  Defendant Salazar also signed and approved these actions.  The four

25    approved right-of-way grants are conditioned on implementation of mitigation measures and

26    monitoring programs identified in the FEIS, the BiOp, the Programmatic Agreement developed

27    pursuant to the National Historic Preservation Act ("NHPA"), 16 U.S.C. section 470 *et seq.*, and

28    other federal rules and regulations.  The ROD also requires the applicant to obtain certification of

1  the Project from CEC before BLM will issue any notices to proceed on the Project.

**FIRST CLAIM FOR RELIEF**

(Violation of the National Environmental Policy Act)

(Against the BLM Defendants)

39.    The paragraphs set forth above are realleged and incorporated herein by reference.

40.    Defendants' actions in approving the Project and certifying its EIS constitute violations of NEPA, 42 U.S.C. section 4321 *et seq.,* and its implementing regulations, 40 C.F.R. section 1500 *et seq.* These regulations apply to BLM by virtue of 43 C.F.R. subpart 1610.

41.    Defendants' approval of the Project without complying with NEPA constitutes a failure to proceed in accordance with law in violation of the APA, 5 U.S.C. section 706(2)(A) and (D). Without limitation, the BLM Defendants' actions violate NEPA and are therefore unlawful in the respects alleged below.

**BLM Unlawfully Segmented Review of Connected Actions**

42.    NEPA requires that connected actions be considered together in the same EIS. 40 C.F.R. §1508.25; *Thomas v. Peterson*, 753 F.2d 754, 758-759 (9th Cir. 1985). Connected actions are those that (1) "[a]utomatically trigger" other actions; (2) "cannot or will not proceed unless other actions are taken previously or simultaneously;" or (3) are "interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. §1508.25.

43.    The Project EIS violates NEPA because it fails to analyze connected actions, such as the EITP. As BLM admits in the FEIS, "[i]n order to accommodate the . . . load generated by ISEGS and five other planned renewable energy generation projects in the region," the Eldorado-Ivanpah Transmission Line "need[s] to be upgraded." FEIS, at 1-7. The purpose of the EITP is to make those needed upgrades. It is thus clear from the text of the EIS that the Project "cannot or will not proceed unless" the EITP is completed. 40 C.F.R. §1508.25. Yet the EIS fails to analyze the impact of the EITP. Therefore, BLM violated NEPA by failing to analyze the EITP as a connected action.

**BLM Failed to Prepare a Programmatic EIS**

44.    In addition to requiring analysis of connected actions in project-specific EISs, such

- 10 -

1  as the ISEGS EIS, NEPA requires agencies to prepare a programmatic EIS where the agency is

2  considering a group of related actions, including actions that are connected, cumulative or

3  similar. *Piedmont Environmental Council v. Federal Energy Regulatory Commission*, 558 F.3d

4  304 (4th Cir. 2009) (citing 40 C.F.R. § 1508.25(a)(1)-(3)). Agencies may not "unreasonably

5  constrict[] the scope of . . . environmental evaluation" by segmenting review of an overall

6  program or group of related actions. *National Wildlife Federation v. Appalachian Regional*

7  *Commission*, 677 F.2d 883, 888 (D.C. Cir. 1981).

8      45.   Here, the Project is one of the many proposed renewable energy projects in the

9  southern deserts of California that either require BLM approval or could not proceed without

10  BLM approval of a related facility. Other such projects include the Sunrise Powerlink

11  Transmission Line, the Tule Wind Project, the Imperial Valley Solar Project, the Esmeralda-San

12  Felipe Geothermal Project, the Genesis Solar Energy Project, the Chevron Energy Solutions

13  Lucerne Valley Solar Project, the Calico Solar Project, the Blythe Solar Project, the Energia

14  Sierra Juarez Generator Tie-Line, the ECO Substation Project, the Campo Wind Project, the

15  Manzanita Wind Project and the Jordan Wind Project, among others. These projects are

16  interrelated in multiple ways. For one, as mentioned, all the projects are located in whole or in

17  part in the California desert and require some form of BLM approval. Additionally, all the

18  projects would connect to the high-voltage wholesale power grid managed by the California

19  Independent System Operator. Further, they are all intended to help California – and the utilities

20  therein – meet their Renewables Portfolio Standard. The projects are also intended to help fulfill

21  the Obama Administration's goal of harnessing renewable energy resources. Indeed, most of the

22  projects are reliant on federal funds made available for renewable energy facilities by the

23  American Recovery and Reinvestment Act.

24      46.   Before conducting project-specific NEPA reviews for each of these interrelated

25  renewable energy  projects, like the ISEGS Project, BLM should have, and must now, prepare a

26  programmatic EIS to study the impacts of widespread industrial-scale energy developments in the

27  southern California deserts and elsewhere in the Southwest. Among other things, the

28  programmatic EIS should inventory the California desert's affected environmental resources as

1   well as its renewable energy resources, and then evaluate the two together to determine where

2   best to allow renewable energy development, – locally as well as remotely – as well as the scale

3   and nature of such development.  The programmatic EIS should also analyze alternatives to

4   developing renewable energy facilities in sensitive desert ecosystems far from load centers,

5   including locally distributed generation such as roof-top solar arrays.  Without a programmatic

6   EIS, BLM has improperly segmented – and will continue to improperly segment – its NEPA

7   review of the unprecedented development of renewable energy facilities in the deserts of southern

8   California and the greater Southwest.

9            **BLM Failed to Define a Proper Purpose and Need for the Project**

10       47.    An EIS must specify the "underlying purpose and need to which the agency is

11   responding in proposing the alternatives including the proposed action."  40 C.F.R. §1502.13.

12   This requirement does not disappear when an applicant, rather than the agency itself, has

13   proposed the action under consideration.  As BLM's NEPA handbook explains, BLM must

14   describe *its* purpose and need, "*not [that of] an applicant or external proponent[]*," for it "is the

15   BLM purpose and need for action that will dictate the range of alternatives."  BLM NEPA

16   Handbook, H-1790-1, at 35 (2008) (emphasis added).  "'Perhaps more importantly' than the need

17   to take private interests into account, 'an agency should always consider the views of Congress,

18   expressed, to the extent that the agency can determine them, in the agency's authorization to act,

19   as well as in other congressional directives.'"  *National Parks & Conservation Association v.*

20   *Bureau of Land Management*, 606 F.3d 1058, 1070 (9th Cir. 2010) (cert. pending) (quoting

21   *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991)).  Accordingly,

22   "the Department of Interior has promulgated no regulations emphasizing the primacy of private

23   interests."  Id., 606 F.3d at 1071.

24       48.    Contrary to this clear requirement, the ISEGS EIS fails to state *BLM's* public

25   purpose and need.  Instead, the EIS erroneously asserts that BLM's purpose and need is merely to

26   "respond to the applicant's application," impermissibly restricting the EIS' consideration of

27   alternatives that serve the public's, rather than the applicant's, interests.  FEIS, at 2-6.  Such not

28   only violates NEPA but also conflicts with the Energy Policy Act, and related Secretarial and

- 12 -

1   Executive Orders, which direct BLM to "encourage the development of environmentally
2   responsible renewable energy" while complying with existing environmental laws.

3                    **BLM Unlawfully Rejected Feasible Alternatives**

4        49.    NEPA requires that an EIS "[r]igorously explore and objectively evaluate all
5   reasonable alternatives" in order to provide a choice that includes environmentally preferable
6   options "so that reviewers may evaluate their comparative merits." 40 C.F.R. §1502.14. The
7   alternatives should be wide-ranging and include options that may require additional approvals or
8   participation by others. *Sierra Club v. Lynn*, 502 F.2d 43, 62 (5th Cir. 1974). "The existence of
9   a viable but unexamined alternative renders an environmental impact statement inadequate."
10  *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008).

11       50.    Contrary to these NEPA requirements, the EIS fails to analyze a reasonable range
12  of alternatives. Without adequate justification, the EIS eliminates from detailed analysis
13  numerous feasible alternatives, including (1) locating the Project on the Ivanpah Dry Lake, (2)
14  locating the Project on private land, and (3) using distributed solar generation instead of remotely
15  located industrial facilities like ISEGS that require lengthy, inefficient and environmentally
16  destructive transmission lines. These alternatives were feasible and would avoid many of the
17  Project's significant impacts, yet they were not properly analyzed in the EIS.

18       51.    BLM's justification for dismissing many of the alternatives it considered only
19  cursorily is that "alternatives that are not within BLM jurisdiction would not necessarily be
20  considered reasonable." FEIS, at 3-2. This is the main rationale BLM used to eliminate the
21  distributed renewable generation alternative. FEIS, at 3-89. However, this justification conflicts
22  with NEPA's direction that agencies may not refuse to analyze alternatives merely because they
23  *may require approvals or participation by others. Lynn, supra*, 502 F.2d at 62.

24       52.    BLM also improperly eliminated numerous other alternatives on cost grounds. For
25  example, in dismissing the alternative of locating the Project on the Ivanpah Dry Lake bed, the
26  EIS fails to provide any evidence to support the claim of excess cost. FEIS, at 3-81. For another,
27  BLM's assertion that locating the Project on private land would be too costly likewise has no
28  support in the record. The EIS fails to explain why it would be less expensive to (a) locate the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1  Project on public lands filled with desert tortoises and purchase 1:1 desert tortoise habitat

2  compensation lands, than to (b) purchase private lands in the first place that are not inhabited by

3  the tortoises.  By eliminating feasible alternatives from detailed analysis, BLM violated NEPA.

4  **BLM Unlawfully Deferred the Formulation of Mitigation Measures**

5   53. Under NEPA, an agency "may not 'act first and study later.'" *Western Land*

6  *Exchange Project v. United States Bureau of Land Management,* 315 F.Supp. 2d 1068, 1092 (D.

7  Nev. 2004) (quoting *National Parks & Conservation Association, supra,* 241 F.3d at 734).

8  NEPA requires mitigation measures to be "reasonably complete," containing "sufficient detail to

9  ensure that environmental consequences have been fairly evaluated." *Robertson v. Methow*

10  *Valley Citizens Council*, 490 U.S. 332, 352 (1989).  Furthermore, mitigation measures are

11  inadequate unless they contain "supporting analytical data." *Sierra Club v. Bosworth,* 510 F.3d

12  1016, 1029 (9th Cir. 2007).

13   54. Here, defendants' EIS repeatedly relies on yet-to-be developed mitigation measures to

14  mitigate the Project's significant impacts. For example, the applicant is required to "submit[] and

15  implement[] an Avian Protection Plan" – required because the Project "has the potential to take a

16  [golden] eagle" – between six and twelve months *after* Project approval.[1]  Relying on documents

17  that have been neither developed nor described at the time of project approval to mitigate

18  potential impacts prevents meaningful public participation in the environmental review process

19  and violates NEPA.

20   55. Additional examples of unlawfully deferred mitigation measures, among others,

21  include:

22    • The future development of a Burrowing Owl Mitigation and Monitoring Plan,

23  intended to mitigate impacts on relocated burrowing owls;

24    • The future development of a Special-Status Plant Protection and Monitoring Plan,

25  intended to ensure that special-status plant species "can be sustained in perpetuity" as "healthy,

26  reproductive populations."  FEIS, at 4.3-118 to 119.

27  ――――――――――――――――――――――

28   [1] FEIS, at 4.3-129.  This mitigation measure was required because any such takings
would violate the Bald and Golden Eagle Protection Act, 16 U.S.C. section 668 *et seq.*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1    •    The future conducting of "floristic surveys" for certain special-status plants,

2    included because no suitable off-site compensation lands have yet been identified for these

3    species;

4    •    The future development of a Draft Bighorn Sheep Mitigation Plan, intended to

5    mitigate the Project's effects on bighorn sheep;

6    •    The future preparation of lists of other special-status plant species that may be

7    present on-site, required because insufficient studies have been conducted to determine whether

8    these species occur on site; and

9    •    The future preparation of a Migratory Bird Treaty Act Conservation Agreement,

10   which would "identify procedures to minimize or eliminate impacts to MTBA species." FEIS at

11   4.3-127 to 128.

12   **BLM Unlawfully Failed to Take a "Hard Look" at the Project's Impacts**

13   56.    NEPA requires federal agencies to take a "hard look" at the environmental impacts

14   of proposed major actions and "provide a full and fair discussion of significant environmental

15   impacts" for the public's review. 40 C.F.R. § 1502.1. "'[G]eneral statements about "possible"

16   effects and "some risk" do not constitute a "hard look" absent a justification regarding why more

17   definitive information could not be provided.'" *Blue Mountains Biodiversity Project v.*

18   *Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (quoting *Neighbors of Cuddy Mountain v.*

19   *United States Forest Service,* 137 F.3d 1372, 1380 (9th Cir. 1998)). BLM failed to discharge this

20   mandate in the following respects, among others:

21   **Impacts on Desert Tortoises**

22   57.    The Project will substantially effect the desert tortoise, a "threatened" species under

23   ESA. The FEIS fails to take a "hard look" at, or mitigate, the following effects of the Project on

24   desert tortoises.

25   58.    First, the EIS fails to analyze the Project's impacts on connectivity between desert

26   tortoise habitats. Specifically, the EIS fails to analyze impacts to connectivity between the

27   Northeastern Mojave and Eastern Mojave desert tortoise "Evolutionarily Significant Units"

28   ("ESUs").

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

59.     Second, the EIS fails to adequately analyze the Project's impacts on desert tortoise habitat fragmentation.

60.     Third, the EIS fails to adequately analyze, or mitigate, the impacts of the planned extensive translocation of desert tortoises on these vulnerable and imperiled creatures.

61.     Fourth. the EIS fails to accurately describe the current tortoise population on the Project site, making an accurate assessment of the Project's impacts impossible.

62.     Fifth, the EIS fails to analyze the effect of the planned new water source upon desert tortoises.  The EIS fails to address the fact that water sources attract ravens, which prey on desert tortoises.

63.     Sixth, the EIS fails to adequately analyze the cumulative impacts on desert tortoises.  For example, the EIS fails to even mention, let alone analyze, the Kern River Gas Transmission Company Mountain Pass Lateral gas pipeline and its contribution to cumulative desert tortoise impacts.

### Impacts on Bighorn Sheep

64.     The EIS fails to analyze and mitigate the Project's effects on desert bighorn sheep in several significant respects.

65.     First, the EIS fails to analyze and mitigate the Project's impacts on desert bighorn sheep foraging habitat.  Yet the Project will eliminate thousands of acres of bighorn sheep foraging habitat.

66.     Second the EIS fails to address how the Project will impact long-distance movements and migration of desert bighorn sheep.

67.     Third, the EIS fails to address how the Project will impact the ground and surface water sources currently used by desert bighorn sheep.  Nor does the EIS explain how the planned new *water source*, at an unknown location, will mitigate for the loss of the sheep's current water sources.

### Impacts on Migratory Birds

68.     The EIS fails to adequately analyze the Project's impacts on migratory birds, including eagles, in several significant respects.  Such birds are protected by the Migratory Bird

1  Treaty Act ("MBTA"), 16 U.S.C. sections 703-712, and the Bald and Golden Eagle Protection

2  Act, 16 U.S.C. section 668 *et seq.*

3       69.    First, the EIS fails to provide even rudimentary information regarding migratory

4  bird impacts.  It fails to identify which migratory bird species are present in the area.  It fails to

5  disclose the normal flying heights for birds in the area.  By failing to include such basic

6  information essential to an analysis of the Project's impacts on migratory birds, BLM failed to

7  take the required "hard look" at those impacts.

8       70.    Second, the EIS fails to adequately address the fact that migratory birds and eagles

9  may collide with taller Project structures, and could be burned if they fly into the concentrated

10 sunlight beam between the solar panels and towers.  Instead of providing a reasoned analysis, the

11 FEIS dismisses these serious impacts on the grounds "there is insufficient data to make definitive

12 conclusions regarding the potential magnitude of these types of impacts at the ISEGS facility."

13 FEIS, at 4.3-40.

**Impacts on Groundwater Resources**

15       71.    The EIS claims that the Project will not impact groundwater resources, yet it admits

16 that the Project's water use will *reduce* groundwater inflows to the Las Vegas Valley

17 groundwater basin, which is hydrologically connected to the aquifer under the Project site and

18 which is already in extreme overdraft.  The EIS also fails to adequately analyze the cumulative

19 impacts of the Project along with other reasonably foreseeable developments upon the Las Vegas

20 Valley groundwater basin.

**Impacts on Rare and Special-Status Plants**

22       72.    The EIS fails to adequately analyze the Project's impacts on rare and special-status

23 plants, including Rusby's desert-mallow (*Sphaeralcea rusbyi* var. *eremicola*).  Under the 2002

24 NEMO Plan, BLM must ensure that the populations and habitats of special-status species "are

25 sufficiently distributed to prevent the need for listing."  NEMO Plan, at 2-6.  Disregarding this

26 mandate, the EIS provides only cursory analysis of the impacts to special-status plants.  For

27 example, BLM failed to conduct adequate surveys of special-status plants.  As BLM admits,

28 "some summer blooming special-status plants may have been missed by the applicant's surveys."

1   FEIS, at 4.3-32. Providing for additional surveys as a mitigation measure does not cure this

2   failure because *post hoc* rationalizations do not satisfy NEPA's foundational purpose of

3   informing the public and decisionmakers of a project's environmental impacts *before* the decision

4   to approve or disapprove the Project is made. *See* 40 C.F.R. § 1500.1. For a second example, the

5   EIS fails to address the Project's impacts on habitat fragmentation for the Rusby's desert-mallow

6   and other special-status plant species.

7   **BLM Unlawfully Failed to Respond to Comments**

8       73.    "NEPA's public comment procedures are at the heart of the NEPA review process."

9   *State of California v. Block,* 690 F.2d 753, 770 (9th Cir. 1982). "Agencies are . . . obligated to

10  provide a 'meaningful reference' to all responsible opposing viewpoints concerning the agency's

11  proposed decision. 40 C.F.R. § 1510(a). . . . Moreover, 'there must be good faith, reasoned

12  analysis in response.'" *Id.* at 773 (internal brackets and citation omitted). NEPA commands that

13  agencies "must acknowledge and respond to comments by outside parties that raise significant

14  scientific uncertainties and reasonably support that such uncertainties exist." *The Lands Council*

15  *v. McNair,* 537 F.3d 981, 1001 (9th Cir. 2008).

16      74. Defendants' EIS fails to provide "reasoned analysis in response" to many of the

17  comments submitted by plaintiff and others about the Project. For example, BLM failed to

18  "acknowledge and respond to comments . . . that raise[d] significant scientific uncertainties,"

19  such as the Project's impacts on (1) desert tortoises, (2) desert bighorn sheep, (3) migratory birds

20  and (4) ground and surface waters.

21  **BLM Unlawfully Failed to Recirculate the EIS**

22      75.    NEPA requires agencies to "prepare supplements to . . . environmental impact

23  statements" where "substantial changes" are made to the Project or "significant new

24  circumstances or information" were added to the environmental document. 40 C.F.R. §

25  1502.9(c)(1). This requirement exists because NEPA requires agencies to submit their actions

26  "for public review *prior* to the issuance of the final EIS." *Block, supra,* 690 F.2d at 771.

27      76.    Contrary to this command, BLM made many "substantial changes" to the Project in

28  the Final EIS and also added "significant new circumstances or information" to the Final EIS.

1 | For example, and for illustrative purposes only, BLM added a new Desert Tortoise Translocation

2 | Plan. BLM also added and/or refined various mitigation measures in the Final EIS. In so doing,

3 | BLM violated NEPA and substantially hindered the public's ability to meaningfully comment on

4 | the Project.

5 | **Allegation Regarding Preliminary and Permanent Injunctive Relief**

6 |     77.    The threatened construction and operation of the Project, enabled by defendants'

7 | approvals, would cause irreparable harm to the environment, to plaintiff, and to the public, in the

8 | respects alleged hereinabove. Therefore, this Court should issue preliminary and permanent

9 | injunctive relief staying and setting aside defendants' approvals of the Project.

10 | **SECOND CLAIM FOR RELIEF**

11 | (Violation of the Federal Land Policy Management Act)

12 | (Against the BLM Defendants)

13 |     78.    The paragraphs set forth above are hereby realleged and incorporated herein by

14 | reference.

15 |     79.    FLPMA establishes minimum standards for resource management plans. 43 U.S.C.

16 | § 1712(c); 43 C.F.R. § 1610.4-6. When developing and revising land use plans, BLM must:

17 | employ "the principles of multiple use and sustainable yield"; use a "systematic interdisciplinary

18 | approach to achieve integrated consideration of physical, biological and other sciences"; give

19 | "priority to protection of areas of critical environmental concern"; consider "present and potential

20 | uses of public lands" and "the relative scarcity of [their] values"; and weigh "long-term benefits

21 | to the public against short-term benefits." *Id*. BLM's implementing regulations also require it to

22 | "estimate and display the . . . effects of implementing each alternative considered in detail,"

23 | guided by NEPA. 43 C.F.R. § 1610.4-6. Yet BLM failed to comply with these, and other related,

24 | requirements, in the respects detailed below, thereby violating FLPMA.

25 |     80.    FLPMA mandates that the "Secretary shall manage the public lands under

26 | principles of multiple use and sustained yield, *in accordance with the land use plans* . . .

27 | developed under [43 U.S.C. section] 1712 . . . when they are available," subject to an exception

28 | not relevant here. 43 U.S.C. § 1732(a) (emphasis added). Here, the governing land use plan is

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1   the CDCA Plan as amended by the more specific 2002 NEMO Plan.  The Project, a high-
2   intensity, single use of resources that will displace all other uses and that will destroy over 5.4
3   square miles of high-quality occupied desert tortoise habitat among other impacts, is plainly
4   inconsistent with both of these plans:

5            a.     The CDCA Plan as amended provides for four distinct multiple use classes
6   ("MUC") based on the sensitivity of resources in each area. The proposed Project site is within
7   the Multiple-Use Class L (Limited Use) zone.  That classification "protects sensitive, natural,
8   scenic, ecological, and cultural resources values.  Public lands designated as Class L are managed
9   to provide for generally lower-intensity, carefully controlled multiple use of resources, while
10  ensuring that sensitive values are not significantly diminished."  CDCA Plan at 13.  Here, the
11  Project is of *high*, not low, intensity and its operation will significantly diminish an extraordinary
12  number of sensitive natural resources, as detailed above.  Therefore, the Project conflicts with the
13  CDCA Plan.

14           b.     The Project is inconsistent with the NEMO Plan in that, among other
15  contradictions: the Project will disturb more than *thirty times* the 100-acre allowable maximum
16  amount of desert tortoise habitat; and the Project violates the NEMO Plan's goals for the recovery
17  of special status species, including but not limited to the desert tortoise.

18      81.     FLPMA requires the Secretary to "prepare and maintain on a continuing basis an
19  inventory of all public lands and their resource and other values . . . , giving priority to areas of
20  critical environmental concern." 43 U.S.C. § 1711(a). Here, no such inventory exists: BLM does
21  not even know, for example, how many special-status species are present on the Project site.

22      82.     Hand-in-hand with the inventory requirement is FLPMA's direction that "[i]n
23  managing the public lands the Secretary shall . . . take any action necessary to prevent
24  unnecessary or undue degradation of the lands." *Id.* § 1732(b).  Because BLM approved the
25  Project in the absence of an adequate inventory of environmental values, it failed to ascertain
26  whether the Project unduly or unnecessarily degraded public lands, and therefore could not guard
27  against such unnecessary or undue degradation, as required.

28      83.     BLM's approval of the Project in the absence of compliance with FLPMA

1   constitutes a failure to proceed in the manner required by law in violation of the APA, 5 U.S.C.

2   section 706(2)(A) and (D).

3                              **THIRD CLAIM FOR RELIEF**

4                          (Violation of the Endangered Species Act)

5                             (Against the FWS Defendants)

6        84.   The paragraphs set forth above are hereby realleged and incorporated herein by

7   reference.

8        85.   The Endangered Species Act establishes a three-step consultation procedure to

9   assure that federal agencies undertaking or approving an action ("action agencies"), such as BLM

10  here, adequately confer with the FWS regarding the potential adverse impacts of proposed

11  projects on federally-listed threatened and endangered species. 16 U.S.C. § 1536(a)(2); 50 C.F.R.

12  § 402.12; *Pacific Coast Federation of Fishermen's Associations v. United States Bureau of*

13  *Reclamation*, 138 F.Supp.2d 1228, 1240-47 (N.D. Cal. 2001) ("*PCFFA*"). These three steps

14  require the action agency to: (1) advise FWS of the area in which the plan activities are proposed

15  (and in response, FWS must provide the federal agency with a list of the endangered and

16  threatened species in the plan area); (2) "prepare a '[biological assessment]' to determine whether

17  such species '[are]' likely to be affected' by the action" (*PCFFA*, 138 F.Supp.2d at 1240 (quoting

18  *Pacific Rivers Council v. Thomas*, 753 F.2d 754, 763 (9th Cir.1985)); 50 C.F.R. § 402.12(I)); and

19  (3) not proceed with the project until FWS has prepared a formal BiOp evaluating the project's

20  potential to adversely affect any species or potentially affected critical habitat. 16 U.S.C. §

21  1536(b); 50 C.F.R. § 402.14. Thereafter, the action agency must independently ensure that any

22  action that it takes will not jeopardize the survival of any listed species or adversely modify its

23  habitat. 16 U.S.C. § 1536(a)(2).

24       86.   Here, FWS violated ESA by failing to use the best scientific and commercial data

25  available to ensure that BLM's actions were not likely to jeopardize listed species, as detailed

26  below.  FWS also violated ESA by failing to re-initiate consultation when such was required by

27  law, as also detailed below.

28       87.   By failing to comply with ESA in its review of the Project, FWS failed to proceed

1  in the manner required by law, in violation of the APA, 5 U.S.C. section 706(2)(A) and (D).

2  **FWS Failed to Use the Best Scientific and Commercial Data Available**

3  88.  ESA requires federal agencies to ensure that their actions are not likely to

4  jeopardize the continued existence of any endangered or threatened species. *See* 16 U.S.C.

5  section 1536(a)(2). ESA further requires that each agency shall use the best scientific and

6  commercial data available to ensure their actions are not likely to jeopardize listed species. *See*

7  16 U.S.C. § 1536(a)(2); *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (agency violated

8  ESA by failing to analyze best scientific and commercial data available); *Bob Marshall Alliance*

9  *v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988) (agency failure to gather listed species and habitat

10  data violated ESA because the agency failed to provide the best scientific and commercial data

11  available); *Greenpeace Foundation v. Mineta*, 122 F.Supp.2d 1123, 1132-1133 (D. Hawaii 2000)

12  (agency ignored relevant data regarding the project's effect on endangered species, and the court

13  held as a matter of law that the agency's decision that the action was "not likely to jeopardize"

14  listed species was arbitrary and capricious); *Conservation Law Foundation v. Watt*, 560 F.Supp.

15  561, 572-573 (D. Mass 1983) (agency violated ESA by failing to incorporate into the biological

16  opinion the best scientific and commercial data available).

17  89.  Here, FWS failed to use the best scientific and commercial data available in its

18  preparation of the BiOp, and thereby violated ESA.  FWS's omissions include, but are not limited

19  to, its failure to adequately survey the Project site for desert tortoises prior to approving the BiOp,

20  its subsequent failure to properly oversee the survey that was belatedly conducted, and its

21  additional omissions alleged below.

22  **FWS Failed to Consider the Impacts of Connected Actions on Listed Species**

23  90.  The BiOp does not consider the effects of connected actions, including but not

24  limited to the EITP, upon listed species, including the desert tortoise, and their designated critical

25  habitat.  Without considering the effects of connected actions, FWS could not adequately ensure

26  that the Project would not jeopardize the continued existence of an endangered or threatened

27  species or adversely modify its critical habitat.  The effects of such connected actions upon listed

28  species should have been considered as indirect effects, cumulative effects, interconnected

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1   effects, or growth-inducing effects *of the Project* under ESA.

2       91.    For example, the BiOp completely fails to address critical habitat "because the

3   [Project] will not take place within critical habitat," yet the EITP, whose completion is necessary

4   for Project operation, will traverse critical habitat.  By failing to include within its BiOp an

5   analysis of the effects of the *entire* Project, including the actions upon which it depends, on the

6   desert tortoise, FWS violated ESA.

7       92.    Additionally, the BiOp fails to adequately consider the effects of the entire Project,

8   including but not limited to the EITP, on desert tortoise habitat connectivity.

9   **FWS Failed to Re-Initiate Consultation When Required**

10      93.    Reinitiation of consultation is required where "discretionary Federal involvement or

11  control over the action has been retained or is authorized by law and," among other things, if "the

12  amount or extent of taking specified in the incidental take statement is exceeded . . . ."  Further,

13  the "duty to reinitiate consultation lies with both the action agency and the consultation agency."

14  *Environmental Protection Information Center v. Simpson Timber Co.*, 255 F.3d 1073, 1076 (9th

15  Cir. 2001).

16      94.    Here, FWS's ITS provides that if "more than 38 subadult or adult desert tortoises

17  are identified for translocation during clearance surveys of the project site, the Bureau must re-

18  initiate consultation."  BiOp, at 60.  Even using the agency's artificially deflated numbers, thirty

19  tortoises have been encountered in the clearing of just 32 percent of the Project site.  The total

20  number of tortoises on the Project site therefore plainly exceeds 38.  FWS is thus required

21  pursuant to its joint duty to reinitiate consultation with BLM.  Its failure to do so thus far violates

22  the ESA.

23  **PRAYER FOR RELIEF**

24      1.    WHEREFORE, plaintiff respectfully requests that the Court:

25      2.    Adjudge and declare that the BLM Defendants acted in an arbitrary and capricious

26  manner by certifying the Project's EIS and approving the Project because the FEIS is legally

27  inadequate under the National Environmental Policy Act, 42 U.S.C. section 4321 *et seq.*, and

28  approval of the Project violates the Federal Land Policy Management Act, 43 U.S.C. section

1  1701 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. section 701 *et seq.*;

2    3.    Order the BLM Defendants to withdraw their EIS and Project approval until such

3  time as the BLM Defendants have complied with the requirements of the National Environmental

4  Policy Act, the Federal Land Policy Management Act, and their implementing regulations;

5    4.    Adjudge and declare that the FWS Defendants' BiOp for the Project violated the

6  Endangered Species Act, 16 U.S.C. section 1531 *et seq.*, and the Administrative Procedure Act, 5

7  U.S.C. section 701 *et seq.*;

8    5.    Order the FWS Defendants to withdraw their BiOp for the Project until such time

9  as the FWS Defendants have complied with the requirements of the Endangered Species Act and

10  its implementing regulations;

11    6.    Adjudge and declare that the FWS Defendants violated ESA by failing to re-initiate

12  consultation when required;

13    7.    Order the FWS Defendants to re-initiate with BLM the consultation required by

14  law;

15    8.    Preliminarily and permanently enjoin all defendants from initiating any activities in

16  furtherance of the Project that could result in any change or alteration of the physical environment

17  unless and until defendants comply with the requirements of NEPA, ESA, FLPMA, and their

18  implementing regulations;

19    9.    Award plaintiff its reasonable attorneys' fees and costs and expenses incurred in

20  connection with the litigation of this action.

21    10.    Grant plaintiff such additional relief as the Court may deem just and proper.

22  Dated: January 12, 2011

23    LAW OFFICES OF STEPHAN C. VOLKER

24  

25  

26    STEPHAN C. VOLKER
    Attorney for Plaintiff
    WESTERN WATERSHEDS PROJECT

27  

28